ORAL ARGUMENT NOT YET SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**State of West Virginia, et al.**,

Petitioners,

v.

**United States Environmental Protection Agency, et al.**,

Respondents.

Case No. 24-1120

(and consolidated cases)

**Opposition of Intervenor-Respondents New York, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Wisconsin, District of Columbia, Boulder, Chicago, Denver, New York City and California Air Resources Board to Petitioners' Stay Motions**

MICHAEL J. MYERS
 *Senior Counsel*
ANDREW G. FRANK
 *Assistant Attorney General*
Environmental Protection Bureau
The Capitol
Albany, NY 12224
(518) 776-2382

*Additional Counsel on
Signature Pages*

LETITIA JAMES
 *Attorney General of New York*
BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
MATTHEW W. GRIECO
 *Senior Assistant Solicitor General*

Dated: June 11, 2024

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**.................................................................iv

GLOSSARY ...............................................................................viii

PRELIMINARY STATEMENT................................................................1

BACKGROUND ..........................................................................1

    A.   Statutory Background ............................................................1

    B.   The Rule ........................................................................3

ARGUMENT ...............................................................................7

POINT I ......................................................................................7

    PETITIONERS FAIL TO SHOW IRREPARABLE HARM ...................................7

    A.   The Rule Will Not Undermine Grid Reliability. ......................8

    B.   The Rule Will Not Force Immediate or Irreversible Decisions About Replacement Generation or Increase Electricity Costs. ..............................................................12

    C.   The Rule Does Not Unreasonably Burden State Agencies......................................................................14

POINT II....................................................................................17

    PETITIONERS ARE UNLIKELY TO SUCCEED ON THE MERITS...................17

    A.   The Rule Respects States' Role in Regulating Existing Sources Under Section 111(d)...............................................17

B.    The Rule Is Based on Adequately Demonstrated Systems of Emission Reduction and Sets Achievable Standards and Limits. ............................................................. 22

    1.    The standards and emission limits based on carbon capture and storage are lawful........................................ 22

    2.    The emission limits for existing coal plants based on co-firing with natural gas are lawful. ............................. 25

    3.    The Rule is consistent with *West Virginia v. EPA* and does not trigger the major questions doctrine. ......... 26

POINT III ........................................................................................ 29

A STAY WOULD HARM STATE INTERVENORS AND THE PUBLIC INTEREST........................................................................................... 29

CONCLUSION ....................................................................................... 31

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .... 40

CERTIFICATE OF SERVICE................................................................. 41

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*C-SPAN v. FCC,*
    545 F.3d 1051 (D.C. Cir. 2008) .......................................................... 20

*Essex Chem. Corp. v. Ruckelshaus,*
    486 F.2d 427 (D.C. Cir. 1973) ............................................................ 23

*FERC v. Electric Power Supply Ass'n,*
    577 U.S. 260 (2016) ................................................................................ 23

*Lignite Energy Council v. EPA,*
    198 F.3d 930 (D.C. Cir. 1999) ............................................................. 23

*MediNatura, Inc. v. FDA,*
    998 F.3d 931 (D.C. Cir. 2021) ............................................................ 14

*Mexichem Specialty Resins, Inc. v. EPA,*
    787 F.3d 544 (D.C. Cir. 2015) ............................................................ 29

*National Asphalt Pavement Ass'n, v. Train,*
    539 F.2d 775 (D.C. Cir. 1976) ...................................................... 12, 23

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................ 15

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) ............................................................ 23

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ....................................................................... 2, 18, 26

## Federal Statutes

42 U.S.C.
§7410 ..............................................................................................16
§7411 .......................................................... 1, 3, 4, 23, 26 ,28
§7411(a)(1) .............................................................................. 2, 28
§7411(b)(1)(A) .................................................................................1
§7411(b)(5) .......................................................................................2
§7411(d) .............................................. 6, 16, 17, 18, 20, 21n.6
§7411(d)(1) ................................................................................ 2, 20
§7411(d)(2)(A) .......................................................................... 3, 20
§7607(b) ...........................................................................................19
§7607(d)(7)(A) ...............................................................................22

## Federal Regulations

40 C.F.R.
§60.5710b(b) .....................................................................................6
§60.5740b(a)(11)-(13) .....................................................................6
§60.5775b(c)(1) ................................................................................6
§60.5775b(e)(2) ..............................................................................19
§60.5876b ..........................................................................................6

36 Fed. Reg. 5931 (March 31, 1971) ...........................................3

88 Fed. Reg. 41,477, 41,478 (June 27, 2023) ...........................4

89 Fed. Reg. 39,798 (May 9, 2024)
.................................... 1, 3-6, 8-9, 12-13, 15-16, 19, 21, 23-25, 27, 29-30

## State Statutes

Ind. Code Ann.
§§14-39-1-1 et seq. ........................................................................24

Kan. Stat. Ann.
§55-1637 ..........................................................................................24

Ky. Rev. Stat.
§353.802(4)..................................................................24

Wyo. Stat.
§37-18-101(a)(iii)..........................................................23

**Miscellaneous Authorities**

Competitive Power Ventures, CPV Shay Energy Center,
https://www.cpv.com/our-projects/cpv-shay-energy-center/
(last visited June 5, 2024)...............................................12

Curtis Tate, *PSC Approves Construction of Gas Power Plant in
Doddridge County* (Apr. 29, 2024), https://wvpublic.org/psc-
approves-construction-of-gas-power-plant-in-doddridge-
county/ ..............................................................................12

Georgia Power, *2023 Integrated Resource Plan Update* 26-27
(2023), https://www.georgiapower.com/content/dam/georgia-
power/pdfs/company-pdfs/2023-irp-update-main-
document.pdf ...................................................................13

Jack Quinn, *Louisiana Approves Largest Renewable Expansion
in State History*, *E&E News* (May 23, 2024),
https://subscriber.politicopro.com/article/eenews/2024/05/23/l
ouisiana-approves-largest-renewable-expansion-in-state-
history-00159454 .............................................................14

LandGate Corp., West Virginia Solar Development Analysis, 2,
4 (2024),
https://www.landgate.com/_files/ugd/fe762a_c89f1350002b4d
5f91b9bc030ac682d2.pdf.................................................14

Letter from State Attorneys General EPA (Feb. 20, 2003),
https://ag.ny.gov/sites/default/files/letters/new-york-notice-of-
intent-to-sue-feb.-20-2003.pdf ..........................................4

N.Y. Indep. Sys. Operator, Inc., *Generator Deactivation Assessment Cayuga Units 1 & 2 (Retirement)* (Apr. 8, 2020), https://www.nyiso.com/documents/20142/1396324/Cayuga1and2-Generation-Deactivation-Assessment-vFinal.pdf/9328ed90-41aa-da58-354f-d02fa755f260 ......................... 10

SoVaNow.com, *Dominion Updates Plan to Extend Life of Clover Plant*, (May 11, 2023) SoVaNow.com, *Dominion Updates Plan to Extend Life of Clover Plant*, (May 11, 2023), https://www.sovanow.com/articles/dominion-updates-plan-to-extend-life-of-clover-plant/ .................................................. 13

States' Comments on Supplemental Notice (Dec. 20, 2023), EPA-HQ-OAR-2023-0072-8203 ............................................. 4

Tim Fitzpatrick, *End of Utah Coal Power in Sight as Rocky Mountain Power Moves to Renewables and Nuclear*, Salt Lake Tribune (updated Apr. 4, 2023), https://www.sltrib.com/renewable-energy/2023/03/31/end-utah-coal-power-sight-rocky ............................................. 14

U.S. Global Change Rsrch. Program, *Fifth National Climate Assessment* (2023), https://nca2023.globalchange.gov/chapter/5/ ................................... 30

*West Virginia v. EPA*, No. 24-1009 (D.C. Cir.), ECF#2058561 (June 7, 2024) ..................... 20

vii

# GLOSSARY

| | |
|---|---|
| ACE rule | Affordable Clean Energy rule, 84 Fed. Reg. 32,520 (July 8, 2019) |
| Act | Clean Air Act |
| Binder Decl. | Declaration of Jon Binder, Deputy Commissioner for Climate Change, Air Resources, and Energy, New York State Department of Environmental Conservation (Exhibit A) |
| Brizius Decl. | Declaration of Alison Brizius, Director, Office of Coastal Zone Management, Massachusetts Executive Office of Energy and Environmental Affairs (Exhibit B) |
| CCS | Carbon capture and sequestration |
| $CO_2$ | Carbon dioxide |
| Creswell Decl. | Declaration of Joel Creswell, Climate Pollution Reduction Program Manager, Washington Department of Ecology (Exhibit C) |
| Davis Decl. | Declaration of Rory Davis, Manager, Regulatory Development Unit, Bureau of Air, Illinois Environmental Protection Agency (Exhibit D) |
| EEI | Edison Electric Institute |
| Env. Interv. Opp. | Opposition of Environmental and Public Health Respondent-Intervenors' to Petitioners' Stay Motions |
| EPA | U.S. Environmental Protection Agency |

| | |
|---|---|
| Fleishman Decl. | Declaration of Erica Fleishman, Director, Oregon Climate Change Research Institute (Exhibit E) |
| Hutchinson Decl. | Declaration of Elijah Hutchinson, Executive Director, New York City Mayor's Office of Climate and Environmental Justice (Exhibit F) |
| Kohlasch Decl. | Declaration of Frank Kohlasch, Assistant Commissioner for Air and Climate Policy, Minnesota Department of Natural Resources (Exhibit G) |
| NRECA | National Rural Electric Cooperative Association |
| Ogletree Decl. | Declaration of Michael Ogletree, Director, Air Division, Colorado Department of Public Health and Environment (Exhibit H) |
| Peters Decl. | Declaration of Karen Peters, Cabinet Executive Officer and Executive Deputy Director, Arizona Department of Environmental Quality(Exhibit I) |
| Rule | New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electricity Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electricity Generating Units; and Repeal of the Affordable Clean Energy Rule, 89 Fed. Reg. 39,798 (May 9, 2024) |
| Scott Decl. | Declaration of Doug Scott, Commissioner, Illinois Commerce Commission (Exhibit J) |
| Snyder Decl. | Declaration of Jennifer Snyder, Energy Planning Section Manager, Washington Utilities and Transportation Commission (Exhibit K) |

Sullivan Decl.          Declaration of Joseph Sullivan, Vice Chair, Minnesota Public Utilities Commission (Exhibit L)

Toor Decl.              Declaration of Will Toor, Executive Director and Chief Energy Officer, Colorado Energy Office (Exhibit M)

Wenrich Decl.           Declaration of Sean Wenrich, Environmental Engineer Manager, Pennsylvania Department of Environmental Protection (Exhibit N)

# PRELIMINARY STATEMENT

The undersigned States and cities (State Intervenors) oppose the motions by several petitioners to stay a final rule issued by the Environmental Protection Agency (EPA) under Section 111 of the Clean Air Act (Act) (42 U.S.C. §7411) to limit carbon dioxide ($CO_2$) from new and existing fossil-fueled power plants, 89 Fed. Reg. 39,798 (May 9, 2024) (Rule). The Rule is based on well-demonstrated approaches that enable plants to operate more cleanly, was carefully designed to preserve the reliability of the power grid, and will deliver long overdue $CO_2$ emission reductions needed to address severe harms caused by climate change. Accordingly, the motions should be denied.

# BACKGROUND

## A.    Statutory Background

Under Section 111, EPA must limit emissions from any category of stationary sources it determines causes or significantly contributes to dangerous air pollution. 42 U.S.C. §7411(b)(1)(A). For such sources, EPA determines standards of performance that "reflect[] the degree of emission limitation achievable through the application of the best

1

system of emission reduction which (taking into account the cost of achieving such reduction and any non-air quality health and environmental impacts and energy requirements) the Administrator determines has been adequately demonstrated." *Id.* §7411(a)(1). For new sources, the statute requires sources to achieve the amount of emission reductions that would be achieved if they used the best system determined by EPA, but sources need not employ the best system to do so. *See id.* §7411(a)(1), (b)(5).

Likewise, for existing sources, "[t]he Agency . . . decides the amount of pollution reduction that ultimately must be achieved." *West Virginia v. EPA*, 597 U.S. 697, 710 (2022); *see* 42 U.S.C. §§7411(a)(1), (d)(1). EPA issues emission guidelines for States, including the degree of emission limitation existing sources would achieve using the best system. *West Virginia*, 597 U.S. at 709-11. States submit plans to EPA "containing the emissions restrictions that they intend to adopt and enforce in order not to exceed the permissible level of pollution established by EPA." *Id.* at 710. States may consider an existing

2

source's remaining useful life and other factors in establishing a standard of performance. 42 U.S.C. §7411(d)(1).

EPA must ensure state plans are "satisfactory" in meeting Section 111(d)'s requirements. *Id.* §7411(d)(2)(A). If a State fails to submit a plan or EPA finds that a state plan is unsatisfactory, EPA must promulgate a federal plan within one year. *Id.*

**B.    The Rule**

The Rule addresses $CO_2$ emissions from fossil-fueled power plants—a stationary-source category EPA long ago determined contributes significantly to dangerous air pollution. *See* 36 Fed. Reg. 5931 (March 31, 1971). Such plants emit about 25 percent of the nation's $CO_2$ emissions, making reducing their pollution "essential to addressing the challenge of climate change." 89 Fed. Reg. at 39,800.

Climate change is causing many harms to State Intervenors, their residents and businesses, such as life-threatening high temperatures, severe droughts and flash floods, sea-level rise, damaging wildfires, and poor air quality. *See id.* at 39,807-10; Binder Decl. (NY) ¶¶9-31; Brizius Decl. (MA) ¶¶8-25; Creswell Decl. (WA) ¶¶4-16; Fleishman Decl. (OR)

3

¶¶7-27; Hutchinson Decl. (NYC) ¶¶6-14; Kohlasch Decl. (MN) ¶¶5-11;
Ogletree Decl. (CO) ¶¶9-14; Peters Decl. (AZ) ¶¶6-17.

Climate change also threatens grid reliability by increasing the
frequency of severe weather—the leading cause of power outages—and
wildfires. *See* States' Comments on Supplemental Notice (Dec. 20,
2023), EPA-HQ-OAR-2023-0072-8203, at 2-5; 88 Fed. Reg. 41,477,
41,478 (June 27, 2023) (Federal Energy Regulatory Commission finding
that severe weather "threatens livelihoods, electric system reliability,
and the Commission's ability to ensure just and reasonable
jurisdictional rates."); Toor Decl. (CO) ¶¶5-9.

In response, many State Intervenors have required fossil-fueled
power plants in their jurisdictions to reduce $CO_2$ emissions. *See* 89 Fed.
Reg. at 39,820-21; Binder Decl. ¶¶33-37; Davis Decl. (IL) ¶¶4, 7;
Ogletree Decl. ¶¶7, 16. State Intervenors have also long advocated for
emission limits on all fossil-fueled power plants. *See, e.g.,* Letter from
State Attorneys General to EPA, add. at 5 and Ex. B (Feb. 20, 2003)
(explaining why Section 111 required EPA to regulate $CO_2$ from power
plants); *see also* 89 Fed. Reg. at 39,813.

4

The Rule would limit those emissions through performance standards for $CO_2$ emitted by combustion turbines at new gas-fired power plants and emission guidelines for electric generating units at existing coal-fired power plants.

First, EPA set performance standards for three subcategories of new combustion turbines—base load, intermediate load, and low load—based on utilization relative to potential electricity output. *Id.* at 39,908. Base load and intermediate load sources must achieve a standard reflecting the degree of limitation achievable through use of highly efficient turbine design. *Id.* at 39,917. In 2032, base load units must achieve a second phase of the standard based on applying carbon capture and storage (CCS), i.e., technology that captures $CO_2$ and stores it underground, with a 90 percent capture rate. *Id.* at 39,802.

For existing coal-fired plants, EPA issued emission guidelines for two subcategories of generating units based on their planned use. For coal-fired units that will operate long term (beyond 2038) and thus have more time to recoup control costs, EPA determined that CCS is the best system of emission reduction. *Id.* at 39,801. Beginning in 2032, long-

term units must capture 90 percent of $CO_2$ emissions. 40 C.F.R.
§60.5775b(c)(1).

Second, for coal-fired units that will operate for the medium-term
(retire by 2038), EPA declined to select CCS as the best system because
these units will not operate long enough to make installation of CCS-
technology cost-effective. Instead, EPA set a less stringent emission
limit based on co-firing coal with 40 percent natural gas as the best
system. *Id.* §60.5775b(c)(2). Existing coal-fired plants that intend to
retire by the end of 2031 are not subject to the Rule's emission
reduction requirements. *See* 40 C.F.R. §§60.5710b(b), 60.5876b.

States have two years to prepare plans establishing performance
standards and compliance schedules for existing long- and medium-
term coal-fired generating units. *Id.* §§60.5780b, 60.5785b(a). States
that conclude a less stringent standard than in the emission guidelines
is warranted due to, for example, a source's remaining useful life, must
follow the relevant provisions in EPA's general regulations for Section
111(d) plans. 89 Fed. Reg. at 39,962 (citing 40 C.F.R. §60.24a).

6

The Rule provides compliance flexibilities, such as extended deadlines and temporary higher emission rates, to address situations like construction delays and temporary need for additional power to ensure grid reliability. 40 C.F.R. §60.5740b(a)(11)-(13).

Petitioners Edison Electric Institute and two utilities moved to stay the Rule's standards and guidelines that are based on CCS. The remaining movants seek to stay the entire Rule.

## ARGUMENT

## POINT I

### PETITIONERS FAIL TO SHOW IRREPARABLE HARM

State Petitioners erroneously argue that they will experience irreparable harm absent a stay because the Rule will purportedly undermine electric grid reliability, force certain power plants to retire prematurely, and impose undue compliance costs on States.[1]

---

[1] Industry Petitioners' claims of harm fail for the reasons explained by EPA and Environmental and Public Health Intervenors.

7

**A.**    **The Rule Will Not Undermine Grid Reliability.**

State Petitioners' grid reliability argument is based on the false premise that the Rule will cause a dramatic shift away from fossil-fueled generation, for which States are purportedly unprepared. But the Rule is not the cause of the shift away from coal-fired generation. That transition has been occurring for over fifteen years driven by economic pressures and technological advancements in natural gas and renewable generation, 89 Fed. Reg. at 39,817, and is expected to continue regardless of the Rule, *id.* at 39,822. Although natural gas plants will continue to be built, their role—regardless of the Rule—is expected to change in the 2030s from providing baseload power to supporting renewable generation. *Id.* at 39,823; Toor Decl. ¶24.

States have successfully managed the transition away from coal-fired generation for more than a decade and are well-equipped to implement the Rule's requirements while maintaining grid reliability. Toor Decl. ¶¶24-25, 49; Scott Decl. (IL) ¶¶10-14; Snyder Decl. (WA) ¶¶4-6; Sullivan Decl. (MN) ¶¶6, 12-13. States with traditionally regulated utilities use information from integrated resource planning to

8

ensure long-term reliability needs. Toor Decl. ¶¶13-16; Sullivan Decl. ¶¶6, 12; Kohlasch Decl. ¶15. States with competitive power markets, like Illinois, have developed similar planning approaches and other tools to achieve $CO_2$ reductions while maintaining reliability. Scott Decl. ¶¶5, 10-13. And States are increasingly using non-fossil fuel generation resources like battery storage to complement wind and solar. Toor Decl. ¶48; *see also* WV Mot. Ex. 24 (Rickerson Decl.) ¶11 (Texas has 6,000 megawatts of battery storage and will add another 10,000 megawatts next summer). These efforts are happening irrespective of the Rule due to economic and ratepayer concerns, other regulatory requirements, and corporate emission-reduction targets. 89 Fed. Reg. at 39,822-23, 39,899-901.

In any event, State Petitioners fail to establish any purported reliability problems caused by the Rule, much less any that would occur during the period relevant to a stay—i.e., the next year or two. Because existing coal-fired plants that intend to retire by 2032 may continue operating without any carbon controls for the next 7½ years, State Petitioners fail to establish that the Rule is forcing any imminent

9

closures. And even if a plant owner made an economic decision to close a plant sooner than 2032 (based in part on the Rule), any retirement decision would be subject to approval by state or regional officials after considering potential grid reliability impacts. *See*, *e.g.*, N.Y. Indep. Sys. Operator, Inc., *Generator Deactivation Assessment Cayuga Units 1 & 2 (Retirement)* (Apr. 8, 2020).[2]

State Petitioners' argument that the Rule will destabilize the grid is also based on the incorrect premise that it forces coal-fired plants to choose between retiring prematurely or installing CCS. *See* WV Mot. 16-18; OH Mot. 24-25. State Petitioners improperly ignore the Rule's compliance options and flexibilities. For example, one of State Petitioners' declarants assumes that all 19 coal-fired units in West Virginia—many of which will be 60-70 years old in the 2030s—will install CCS to comply with the Rule. WV Mot. Ex. 28 (Crowder Decl.) ¶22. But this assumption ignores that a unit may instead operate for

---

[2] All URLs for applicable documents are provided in the Table of Authorities.

the medium term by retiring before 2039, and use West Virginia's plentiful natural gas supply and 16,000-mile pipeline network to meet the Rule's less stringent co-firing-based standard. Another declarant argues it would be too costly for a coal-fired unit scheduled to retire in 2032 to co-fire with natural gas, OH Mot. Ex. 6 (Bridson Decl.) ¶¶19-21, ignoring that such a unit may be eligible for a less stringent standard under the remaining useful life analysis.

The record also contradicts State Petitioners' contention (WV Mot. 16) that the Rule will jeopardize reliability by "stifling" the building of new gas plants. For example, they argue that new gas plants cannot successfully use CCS at a 90 percent capture rate or meet the 2032 deadline due to construction or permitting delays. But EPA analyzed these concerns extensively, 89 Fed. Reg. at 39,925-38, and its factual conclusions refuting these concerns are amply supported and entitled to deference. *See National Asphalt Pavement Ass'n v. Train*, 539 F.2d 775, 786 (D.C. Cir. 1976). Indeed, West Virginia recently approved a new gas plant that intends to install CCS and meet a 90-95 percent capture

11

rate.[3] And a new gas plant with CCS that finds it cannot meet the 2032 deadline may seek a compliance extension. 89 Fed. Reg. at 39,952.

## B. The Rule Will Not Force Immediate or Irreversible Decisions About Replacement Generation or Increase Electricity Costs.

State Petitioners also err in arguing that the Rule forces them to make immediate and irreversible decisions to obtain replacement power for plants that will purportedly retire or not be built. *See* WV Mot. 17-19; OH Mot. 23-26. This argument runs counter to EPA's technical findings about the feasibility and schedule for installing CCS or co-firing, which are fully supported by the record. *Infra* at 22-25; *see* Kohlasch ¶¶32-33, Peters ¶¶36-37, and Toor ¶¶38-39 (sources in Minnesota, Arizona, and Colorado have viable compliance options).

State Petitioners are also wrong that power companies' compliance decisions are irreversible. For example, owners of plants in Georgia and Virginia recently reversed decisions they had made several

---

[3] Curtis Tate, *PSC Approves Construction of Gas Power Plant in Doddridge County*, (Apr. 29, 2024); Competitive Power Ventures, CPV Shay Energy Center (n.d.).

years before to retire generating units.[4] Under the Rule, the owner of a coal plant scheduled to retire in 2039 could, for instance, decide in late 2026 (after state plan deadline and likely after a merits decision here) to instead retire the plant in 2038—and have sufficient time to comply with the Rule's more lenient co-firing-based standard. *See* 89 Fed. Reg. at 39,893-94. The State in which such a plant is located could submit a plan revision including a revised emission standard and compliance schedule. *See id.* at 39,961.

State Petitioners further argue that the cost of replacement capacity will raise electricity rates now (WV Mot. 17-18; OH Mot. 25), but enormous amounts of capacity were *already* being planned before the Rule, including in State Petitioners' jurisdictions.[5] Petitioners fail to

---

[4] *See* Georgia Power, *2023 Integrated Resource Plan Update* 26-27 (2023); SoVaNow.com, *Dominion Updates Plan to Extend Life of Clover Plant*, (May 11, 2023).

[5] *See*, *e.g.*, Jack Quinn, *Louisiana Approves Largest Renewable Expansion in State History*, *E&E News* (May 23, 2024); Tim Fitzpatrick, *End of Utah Coal Power in Sight as Rocky Mountain Power Moves to*

offer any evidence of replacement power costs attributable to the Rule rather than to such existing transition plans. This failure is critical because costs from preexisting transition plans are not a result of the Rule. *See MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) (plaintiff "did not demonstrate that any harm it is suffering is directly traceable" to challenged agency action).

## C.    The Rule Does Not Unreasonably Burden State Agencies.

Contrary to State Petitioners' argument (WV Mot. 20; OH Mot. 26), ordinary costs associated with preparing a state plan under the Act's cooperative federalism structure do not qualify as irreparable harm warranting a stay. Holding otherwise would improperly transform a stay from an "extraordinary remedy" into a commonplace event under the Act and similar statutes. *Cf. Nken v. Holder*, 556 U.S. 418, 432 (2009) (quotation marks omitted).

---

*Renewables and Nuclear*, Salt Lake Tribune (updated Apr. 4, 2023); LandGate Corp., West Virginia Solar Development Analysis, 2, 4 (2024).

Even if compliance costs may constitute irreparable harm where they severely burden States, the Rule does not impose such burdens. The obligations the Rule imposes on state agencies are typical for power sector air regulations: tasks like identifying electricity-generating units that have compliance obligations, determining an emissions baseline based on recent operations, and coordinating with grid officials to ensure consideration of any reliability impacts of compliance decisions. *See* 89 Fed. Reg. at 39,957; Kohlasch Decl. ¶¶32-33; Peters Decl. ¶27. Although States that decide to undertake a remaining useful life analysis will do additional work, the number of units that will be included in state plans is relatively small. 89 Fed. Reg. at 39,997-98. For example, most State Petitioners that submitted declarations listed only two or three units that will be included in their state plans. *See* WV Mot. Ex. 27 (Dowd Decl.) ¶9 (Virginia, two units); Ex. 13 (Nowakowski Decl.) ¶6 (Montana, two units); Ex. 3 (Osborne Decl.) ¶10 (Arkansas, three units); Ex. 8 (Stuckey Decl.) ¶12 (Indiana, two units).

Several State Intervenors will be preparing plans with a similar or greater number of sources. *See* Davis Decl. ¶18 (Illinois, four units);

15

Kohlasch Decl. ¶26 (Minnesota, four units); Peters Decl. ¶35 (Arizona, five units). Based on their experience in drafting similar plans under Section 111(d) or Section 110, these State Intervenors expect to submit plans on timelines consistent with those in the Rule using existing staff resources. *See* Davis Decl. ¶15; Kohlasch Decl. ¶27; Peters Decl. ¶¶30-32.

Moreover, State Petitioners fail to show irreparable harm based on purported costs from state plan development because they do not—and cannot—dispute that the Rule provides numerous ways for States to avoid the costs Petitioners invoke, and Petitioners' declarations reflect incorrect and unsupported assumptions that avoid mentioning those flexibilities. For example, West Virginia's environmental agency asserts that the Rule will require it to double current staffing levels and spend nearly $10 million, based on the assumption that *all* of West Virginia's 19 coal-fired units will install CCS. Crowder Decl. ¶22. But another West Virginia declarant contradicts this assumption, stating that only *one* unit is a candidate to install CCS. WV Mot. Ex. 29 (Preservati Decl.) ¶13. And Ohio's environmental agency asserts that

16

the Rule will impose "immense compliance burdens" but fails to explain purported number of staff hours or costs that would allegedly be incurred during the time needed for the Court to review the Rule. *See* Ex. 2 (Hodanbosi Decl.) at 4; *cf.* WV Mot. Ex. 25 (Parker Decl.) ¶40 (unsupported statement that Utah agency will likely incur "hundreds of thousands of dollars" to understand the Rule).

Moreover, States may avoid the costs of preparing plans altogether by allowing EPA to issue a federal plan to regulate existing sources in that State—an approach at least one of State Intervenor (Pennsylvania) is contemplating. Wenrich Decl. ¶21.

## POINT II

### PETITIONERS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.    The Rule Respects States' Role in Regulating Existing Sources Under Section 111(d).

State Petitioners incorrectly argue that the Rule's use of presumptive standards infringes on state sovereignty. First, State Petitioners contend (WV Mot. 10-11) that the Rule's emission guidelines

17

exceed EPA's statutory role by providing the overall emission reductions that state plans must achieve—i.e., the reductions that would be achieved under the guidelines' presumptive standards. But *West Virginia* foreclosed this argument, explaining that EPA "retains the primary regulatory role in Section 111(d)" to "decid[e] the amount of pollution reduction that must ultimately be achieved" through state plans. 597 U.S. at 710. EPA properly fulfilled that "primary regulatory role" here, without infringing on the States' role to submit plans "containing the emissions restrictions that they intend to adopt and enforce in order not to exceed the permissible level of pollution established by EPA," *id.*

Second, the presumptive standards are not binding, as State Petitioners wrongly argue (*see* WV Mot. 12). States may use a different standard of performance than the presumptively approved standard so long as it achieves the same emission reductions. The Rule provides several alternative forms of performance standards, including a mass-based (tonnage) standard on annual emissions from individual generating units. 40 C.F.R. §60.5775b(e)(2). Separately, States also may

18

invoke a source's remaining useful life and other factors to apply standards of performance to that source that are less stringent than EPA's presumptive standards. 89 Fed. Reg. at 39,962. Thus, "a state plan may not necessarily achieve the same stringency as each source achieving the EPA's presumptive standards of performance." *Id.* at 39,956 n.911. And States have the ability to obtain judicial review of EPA's disapproval of state plans (including standards set using reasonable useful life determinations). *See* 42 U.S.C. §7607(b).

State Petitioners' arguments (WV Mot. 12-13; OH Mot. 20-21) about certain criteria for States to apply a less stringent standard based on remaining useful life and other factors are not properly raised in this case. EPA promulgated these criteria through a separate regulation not at issue here. That separate regulation is subject to a separate legal challenge pending in this Court, and many of State Petitioners here raised the same argument in that other case. *See* Petitioners' Opening Br. 21, *West Virginia v. EPA*, No. 24-1009 (D.C. Cir.), ECF#2058561 (June 7, 2024). Any objections about that separate regulation must be litigated in the separate challenge. *See, e.g.*, *C-SPAN v. FCC*, 545 F.3d

19

1051, 1055-1057 (D.C. Cir. 2008) (plaintiff lacks standing where injury alleged is not traceable to challenged regulation).

In any event, State Petitioners' arguments are meritless. Section 111(d) instructs EPA to "permit" States to consider the remaining useful life of qualifying facilities, but state discretion is not unfettered because a state plan—including a state decision on less stringent standards on remaining-useful-life grounds—must still be "satisfactory" in EPA's discretion. *See* 42 U.S.C. §7411(d)(1), (2)(A).

State Petitioners also incorrectly argue that EPA infringed on States' ability to consider plants' remaining useful life by setting a less stringent emission guideline for existing coal-fired units that retire in the medium term. *See* OH Mot. 20-21. That argument improperly conflates the roles of EPA and States in the Act's cooperative-federalism structure. EPA is statutorily required under Section 111(a)(1)'s definition of "standard of performance" to consider cost in determining the best system of emission reduction and may as part of that determination establish subcategories that account for differences among sources. 89 Fed. Reg. at 39,828. EPA properly did so here in

20

determining that it is not cost-effective for units that will operate for only the medium term to install CCS. *See id.* at 39,890-91.

This cost consideration is separate from, and does not improperly tread on, States' ability to invoke a unit's remaining useful life to impose an emission standard less stringent than the presumptive standard. For example, a medium-term unit that intends to retire in 2033—i.e., a brief period into the medium-term category—and must build a lengthy pipeline to access natural gas to co-fire, could be eligible for a less stringent standard based on remaining useful life and other factors, such as cost.[6]

---

[6] State Petitioners' arguments about irreparable harms to their state sovereignty (WV Mot. 20; OH Mot. 22) fail because, as discussed above, the Rule properly respects States' role under Section 111(d).

**B.    The Rule Is Based on Adequately Demonstrated Systems of Emission Reduction and Sets Achievable Standards and Limits.**

**1.    The standards and emission limits based on carbon capture and storage are lawful.**

Contrary to State Petitioners' arguments (WV Mot. 6-10; OH Mot. 9-18), and as Environmental and Public Health Intervenors correctly explain, the administrative record amply supports EPA's determination that CCS is adequately demonstrated and that a standard based on 90 percent capture is achievable. Env. Interv. Opp. 4-9.[7] A system is adequately demonstrated if it has been shown to be "reasonably reliable," "reasonably efficient," and to "serve the interests of pollution control without becoming exorbitantly costly." *Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 433 (D.C. Cir. 1973). Petitioners agree that is the relevant standard here. *E.g.*, EEI Mot. 6, NRECA Mot. 9, WV Mot. 6. EPA's technical, record-based finding in establishing standards

---

[7] Factual assertions made by State Petitioners through declarations in arguing likelihood of success on the merits (WV Mot. 8, 15; OH Mot. 15-18) are not properly before the Court. *See* 42 U.S.C. §7607(d)(7)(A).

22

of performance is entitled to deference. *See National Asphalt Pavement Ass'n*, 539 F.2d at 786; *cf. FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (deferring to FERC's record-based findings). EPA's conclusion is further supported by this Court's well-settled precedent that Section 111 is designed to spur broader adoption of emission-control technologies that are new and in use but not yet routinely implemented. *See Lignite Energy Council v. EPA*, 198 F.3d 930, 933-34 (D.C. Cir. 1999) (per curiam); *Sierra Club v. Costle*, 657 F.2d 298, 364 (D.C. Cir. 1981).

State actions and laws—including by some of the State Petitioners here—confirm EPA's well-supported findings that CCS is adequately demonstrated. *See* 89 Fed. Reg. at 39,820-21. For example, Wyoming, by statute, defines low-carbon electricity to mean electricity generated while using CCS, Wyo. Stat. §37-18-101(a)(iii), and requires utilities serving 10,000 or more customers to use CCS by 2033, *id.* §37-18-102(a)(i)-(ii). Wyoming both anticipates and requires CCS generation to be "reliable," *id.* §37-18-101(a)(iv)—belying State Petitioners' arguments that CCS will undermine power grids (see *supra* at 8-12).

23

Moreover, Kansas and Indiana have each enacted permitting and regulatory processes for CCS. Kan. Stat. Ann. §55-1637; Ind. Code Ann. §§14-39-1-1 et seq. Kentucky's legislature found that CCS will enable Kentucky "to utilize diverse fuel sources" and allow Kentucky industries to remain competitive. Ky. Rev. Stat. §353.802(4).

EPA also reasonably explained why CCS is cost reasonable. As EPA noted, it previously considered CCS as the best system for both the 2015 Clean Power Plan and the subsequent 2019 ACE rule and rejected it those times. *See* 89 Fed. Reg. at 39,882. But two things have fundamentally changed the calculus. First, the estimated cost of installing CCS dropped dramatically from $74 per megawatt-hour in 2015 to $44 per megawatt-hour in 2022—a 40 percent decrease. *Id.* Second, Congress enacted a 70 percent increase in the tax credit for CCS. *Id.* at 39,819. The resulting costs of CCS over the 12-year amortization period are commensurate with costs under prior EPA regulations that have been upheld. *Id.* at 39,879, 39,882.

## 2. The emission limits for existing coal plants based on co-firing with natural gas are lawful.

Some State Petitioners (*see* WV Mot. 10)—but not all petitioners (*see* OH Mot. 12-18; EEI Mot. 2)—also challenge the best system for medium-term coal generating units, which EPA identified as co-firing natural gas at 40 percent of annual heat input. Their arguments fail.

As EPA amply explained, nearly half of coal-fired plants in the nation already use natural gas to some extent—and 29 plants already co-fire at 40 percent annual heat input. *See* 89 Fed. Reg. at 39,892. Contrary to State Petitioners' contentions (*see* WV Mot 10), the Rule's co-firing compliance date of 2030 is reasonable. A study by a consulting firm frequently retained by power companies found that conversion to co-firing takes only about two-and-a-half to three years from the decision to co-fire until commercial operation. *See* 89 Fed. Reg. at 39,894 (citing Sargent & Lundy, *Natural Gas Co-Firing* 17 (Mar. 2023)).

### 3. The Rule is consistent with *West Virginia v. EPA* and does not trigger the major questions doctrine.

Relying on *West Virginia*, some (but not all) State Petitioners argue that the Rule violates the major questions doctrine. But these arguments misconstrue both *West Virginia* and the Rule.

In *West Virginia*, the Court explained that EPA's role under Section 111 is to identify, and use as the basis for emissions standards and guidelines, "measures that would reduce pollution by causing plants to operate more cleanly." 597 U.S. at 706; *see id.* at 725. The Court determined that a prior EPA rule (the Clean Power Plan) strayed outside of this statutory role, and triggered application of the major questions doctrine, because it sought to fundamentally alter the overall power system by requiring coal-fired and gas-fired sources to shift power generation to other sources and reduce their own generation. *Id.* at 727-28.

Here, the Rule's identification of CCS as the best system for long-term coal plants and new gas plants falls squarely within the Court's understanding of EPA's role under Section 111, and thus does not

26

implicate the major questions doctrine, because CCS improves emissions at an individual source. Far from "remaking" the industry by directing coal plants to cease operations or produce a smaller share of energy generation (WV Mot. 14), CCS allows coal-fired sources to continue operating, burning coal, and producing power—with the resulting $CO_2$ emissions captured and stored underground instead of being released into the atmosphere. *See* 89 Fed. Reg. at 39,888.

Nor does the Rule implicate the major questions doctrine merely because the costs of installing CCS might indirectly cause some coal-fired plants to reduce their energy generation levels or retire. *See* WV Mot. 16; NRECA Mot. 2-3. EPA demonstrated that the number of plants likely to retire under a CCS-based rule is comparable to the number of plants likely to retire under other rules that would require less capital investment for compliance. *See* 89 Fed. Reg. at 39,899-900. Indeed, some plants that install CCS find it cost-effective to fire coal at a higher capacity than before, and at a higher profit, because a tax credit is calculated based on the total tons of $CO_2$ captured. *See id.* at 39,900.

27

In any event, the major questions doctrine is not triggered merely because compliance with an agency regulation involves costs. The Court made this clear in *West Virginia* by contrasting the Clean Power Plan's generation-shifting approach with measures that may indirectly cause sources to "lose some share of the electricity market" by imposing regulatory costs to implement measures to operate more cleanly. *See* 597 U.S. at 731 n.4.

Indeed, under petitioners' view, *any* meaningful regulation of coal plants under Section 111 would trigger the major questions doctrine because such regulations would impose compliance costs and thus potentially indirectly cause some plants to retire rather than comply. But EPA is statutorily required to weigh the degree of emission limitation achievable against *the cost* of achieving such reduction in determining the best system. 42 U.S.C. §7411(a)(1). Whether EPA rationally discharged its congressionally delegated responsibility to weigh costs (which it did, see *supra* at 24) presents a conventional record-review question, not a major question.

28

## POINT III

### A STAY WOULD HARM STATE INTERVENORS AND THE PUBLIC INTEREST

In deciding whether to grant a stay, the Court also considers the interests of stakeholders who supported the Rule and stand to suffer harm if it is stayed. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015). Here, a stay would severely harm State Intervenors and the public interest by likely delaying long overdue emission reductions needed to address numerous and worsening climate-related harms, including jeopardizing grid reliability.

The Rule is expected to achieve substantial reductions in greenhouse gas emissions, specifically, 1.38 billion metric tons of $CO_2$-equivalent emissions during the 2028-2047 period—equal to the annual emissions of the *entire* U.S. electric power sector. *See* 89 Fed. Reg. at 40,004. And it has been more than 20 years since several State Intervenors petitioned EPA to set nationwide limits on $CO_2$ from power plants. *See supra* at 4. In the meantime, climate change has accelerated and the harms to our States, cities, and residents have multiplied. *E.g.*,

29

Fleishman Decl. ¶¶ 8-14; Hutchinson Decl. ¶¶9-12; Kohlasch Decl. ¶¶5-6; Ogletree Decl. ¶¶10-13; Peters Decl. ¶¶6-7, 10-16. Further delays in substantially cutting carbon pollution will make it more difficult—and costly—for State Intervenors to avoid catastrophic harms. *See* 89 Fed. Reg. at 39,809-10; Binder Decl. ¶¶22-26; Brizius Decl. ¶¶18-25.

Moreover, further delaying emission reductions would threaten grid reliability and increase electricity rates because foregone reductions would contribute to more frequent and more extreme weather events—the leading cause of power outages. States and power companies are already spending growing sums of money to respond to and prevent power outages caused by severe storms and searing heat waves, and to address wildfires. *See*, *e.g.*, Binder Decl. ¶¶25-27; Toor Decl. ¶¶6-9; Scott Decl. ¶6; WV Mot. Ex. 12 (Purvis Decl.) ¶66. These harms are expected to escalate unless immediate steps are taken to address climate change. *See* U.S. Global Change Rsrch. Program, *Fifth National Climate Assessment* (2023), ch. 5, at 5-4. Thus, contrary to Petitioners' claims, prompt implementation of the Rule will promote grid reliability, while a stay would undermine it.

30

## CONCLUSION

The Court should deny the stay motions. If the Court grants Edison Electric Institute's request for partial stay of the Rule, it should deny the remaining stay motions.

Dated: June 11, 2024

Respectfully submitted,

FOR THE STATE OF NEW YORK

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
MATTHEW W. GRIECO
  *Senior Assistant Solicitor General*
MORGAN A. COSTELLO
  *Chief, Affirmative Litigation Section*
ANDREW G. FRANK
  *Assistant Attorney General*

LETITIA JAMES
Attorney General

*/s/ Michael J. Myers*[8]
MICHAEL J. MYERS
Senior Counsel
Environmental Protection
  Bureau
The Capitol
Albany, NY 12224
(518) 776-2382
michael.myers@ag.ny.gov

---

[8] Counsel for the State of New York certifies that the other parties listed in the signature blocks consent to this filing.

31

FOR THE STATE OF
ARIZONA

KRIS MAYES
Attorney General

*/s/ Paul Phelps*

By: _____

PAUL PHELPS
Assistant Attorney General
SHELLY CUTTS
Acting Section Chief
  Counsel
Environmental Enforcement
  Section
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8543
Environmental@azag.gov

FOR THE STATE OF
CONNECTICUT

*/s/ Scott N. Koschwitz*

By: _____

MATTHEW I. LEVINE
Deputy Assoc. Atty. General
SCOTT N. KOSCHWITZ
Assistant Attorney General
Office of the Attorney
  General
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5250
Scott.koschwitz@ct.gov

FOR THE STATE OF
COLORADO

PHILIP J. WEISER
Attorney General

*/s/ Carrie Noteboom*

By: _____

CARRIE NOTEBOOM
Assistant Deputy Attorney
  General
GABBY FALCON
SARAH QUIGLEY
Assistant Attorneys General
Natural Resources and
  Environment Section
Ralph C. Carr Colorado
  Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
(720) 508-6285
carrie.noteboom@coag.gov

FOR THE STATE OF
DELAWARE

KATHLEEN JENNINGS
Attorney General

*/s/ Vanessa L. Kassab*

By: _____

CHRISTIAN D. WRIGHT
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB

32

FOR THE STATE OF HAWAI'I

ANNE E. LOPEZ
Attorney General

*/s/ Lyle T. Leonard*

By:  _____

LYLE T. LEONARD
Deputy Attorney General
465 S. King Street, #200
Honolulu, HI 96813
(808) 587-3050
Lyle.t.leonard@hawaii.gov


FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

*/s/ Emma Akrawi*

By:  _____

EMMA AKRAWI
Assistant Attorney General
Natural Resources Div.
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Emma.akrawi@maine.gov

Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

*/s/ Jason E. James*

By:  _____

MATTHEW DUNN
Chief, Environmental Enforcement/Asbestos Litigation Division
JASON E. JAMES
Assistant Attorney General
201 W. Pointe Dr., Suite 7
Belleville, IL 62226
(872) 276-3583
Jason.james@ilag.gov

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General

*/s/ Michael F. Strande*

By:  _____

33

FOR THE
COMMONWEALTH OF
MASSACHUSETTS

ANDREA JOY CAMBPELL
Attorney General

*/s/ Turner Smith*

By: _____
Assistant Attorney General
  & Deputy Bureau Chief
JULIA JONAS-DAY
Assistant Attorney General
  for Climate Change
BENJAMIN MESHOULAM
Senior Advisor
SETH SCHOFIELD
Senior Appellate Counsel
Energy and Env. Bureau
Office of the Attorney
  General
One Ashburton Place, 18th
  Floor
Boston, MA 02108
(617) 727-2200
Turner.smith@mass.gov

FOR THE STATE OF
MINNESOTA

KEITH ELLISON
Attorney General

*/s/ Peter N. Surdo*

By: _____

MICHAEL F. STRANDE
Assistant Attorney General
STEVEN J. GOLDSTEIN
Special Assistant Attorney
  General
Office of the Attorney
  General
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3421
Michael.strande@oag.state.md.us

FOR THE PEOPLE OF
THE STATE OF
MICHIGAN

DANA NESSEL
Attorney General

*/s/ Elizabeth Morrisseau*

By: _____
ELIZABETH
MORRISSEAU
Assistant Attorney General
Environment, Natural
  Resources, and Agriculture
  Division
G. Mennen Williams
  Building, 6th Floor
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
MorrisseauE@michigan.gov

34

Assistant Attorney General
Minnesota Attorney
  General's Office
445 Minnesota St., S.1400
St. Paul, MN 55101
(651) 583-6667
Peter.surdo@ag.state.mn.us

FOR THE STATE OF NEW
MEXICO

RAUL TORREZ
Attorney General

*/s/ William Grantham*

By: _____
WILLIAM GRANTHAM
Assistant Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 717-3250
wgrantham@nmag.gov

FOR THE STATE OF
OREGON

ELLEN F. ROSENBLUM
Attorney General

*/s/ Paul Garrahan*

By: _____
PAUL GARRAHAN
Attorney-in-Charge

FOR THE STATE OF NEW
JERSEY

MATTHEW J. PLATKIN
Attorney General

*/s/ Lisa J. Morelli*

By: _____
LISA J. MORELLI
Deputy Attorney General
NELL M. HRYSHKO
New Jersey Division of Law
25 Market Street
Trenton, NJ 08625
(609) 376-2740
Lisa.morelli@law.njoag.gov

FOR THE STATE OF
NORTH CAROLINA

JOSHUA H. STEIN
Attorney General

*/s/ Asher P. Spiller*

By: _____
DANIEL S. HIRSCHMAN
Sr. Deputy Attorney General
ASHER P. SPILLER
Special Deputy Attorney
  General
TAYLOR H. CRABTREE
Assistant Attorney General
North Carolina Dept. of
  Justice

STEVE NOVICK
Special Assistant Attorney
  General
Natural Resources Section
General Counsel Div.
Oregon Dept. of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4540
Paul.garrahan@doj.state.or.us

FOR THE STATE OF
RHODE ISLAND

PETER F. NERONHA
Attorney General

*/s/Alison H. Carney*
By: _____
ALISON HOFFMAN
  CARNEY
Assistant Attorney General
Chief, Environmental and
  Energy Unit
150 S. Main St.
Providence, RI 02903
(401) 274-440 ext. 2116
acarney@riag.ri.gov

P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
aspiller@ncdoj.gov

FOR THE
COMMONWEALTH OF
PENNSYLVANIA

MICHELLE A. HENRY
Attorney General

*/s/ Ann Johnston*
By: _____
ANN JOHNSTON
Asst. Chief Dep. Atty.
General
Civil Environmental Enf.
Unit
Office of the Attorney
General
Strawberry Sq., 17th Floor
Harrisburg, PA 17120
(717) 417-3698
ajohnston@attorneygeneral.gov

36

FOR THE STATE OF
WASHINGTON

ROBERT W. FERGUSON
Attorney General

*/s/Christopher H. Reitz*

By: _____

CHRISTOPHER H. REITZ
CAROLINE E. CRESS
ZACHARY S. PACKER
Assistant Attorneys General
Office of Attorney General
P.O. Box 40117
Olympia, WA 98504-0117
(360) 586-4614
Chris.reitz@atg.wa.gov

FOR THE DISTRICT OF
COLUMBIA

BRIAN L. SCHWALB
Attorney General

*/s/ Caroline S. Van Zile*

By: _____

CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney
    General for the District of
    Columbia
400 6th St. NW
Washington, DC 20001
(202) 727-66609
Caroline.vanzile@dc.gov

FOR THE STATE OF
VERMONT

CHARITY R. CLARK
Attorney General

*/s/Hannah Yindra*

By: _____

HANNAH YINDRA
Assistant Attorney General
Office of the Attorney
    General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.yindra@vermont.gov

FOR THE STATE OF
WISCONSIN

JOSHUA L. KAUL
Attorney General

*/s/Gabe Johnson-Karp*

By: _____

GABE JOHNSON-KARP
Assistant Attorney General
Wisconsin Dept. of Justice
P.O. Box 5307-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

37

FOR THE CITY OF CHICAGO

MARY RICHARDSON-LOWRY
Corporation Counsel

*/s/Myriam Zreczny Kasper*

By: _____
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel
Appeal Division
City of Chicago Dept. of Law
2 N. LaSalle St., S. 580
Chicago, IL 60602
(312) 744-3564
Myriam.kasper@cityofchicago.org

FOR THE CITY OF NEW YORK

MURIEL GOODE-TRUFANT
Acting Corporation Counsel

*/s/Christopher G. King*

By: _____
CHRISTOPHER G. KING
ALICE R. BAKER
Senior Counsel
New York City Law Dept.
100 Church Street
New York, NY 10007

FOR THE CITY OF BOULDER

TERESA TAYLOR TATE
City Attorney

*/s/Luis A. Toro*

By: _____
LUIS A. TORO
Senior Counsel
City of Boulder
1777 Broadway, 2nd Flr.
(303) 441-3020
ToroL@bouldercolorado.gov

FOR THE CITY AND COUNTY OF DENVER

KERRY TIPPER
City Attorney

*/s/Edward J. Gorman*

By: _____
EDWARD J. GORMAN
Senior Assistant County
  Attorney
201 W. Colfax Ave.
Dept. 1207
Denver, CO 80202
(720) 913-3275
Edward.gorman@denvergov.org

38

(212) 356-2074
cking@law.nyc.gov

FOR THE CALIFORNIA
AIR RESOURCES BOARD

ROB BONTA
Attorney General

*/s/ Theordore A.B.*
*McCombs*

By: _____

TRACY L. WINSOR
Senior Assistant Attorney
 General
MYUNG J. PARK
Supervising Deputy
 Attorney General
KATHERINE GAUMOND
THEORDORE A.B.
 MCCOMBS
JONATHAN A. WIENER
Deputy Attorneys General
600 W. Broadway
San Diego, CA 92101
(619) 738-9003
Theordore.mccombs@doj.ca.
 gov

39

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

The undersigned attorney, Michael J. Myers, hereby certifies:

1.    This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2). According to the word processing system used in this office, this document contains 5,190 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 27(d)(1)(E) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 27(d)(1)(E) because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook.

Dated: June 11, 2024                  /s/ *Michael J. Myers*
                                      Michael J. Myers

40

## CERTIFICATE OF SERVICE

I certify that the foregoing Opposition to Petitioners' Stay Motions was filed on June 11, 2024, with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system and that, therefore, service was accomplished upon counsel of record by the Court's system.

Dated: June 11, 2024                */s/ Michael J. Myers*
                                     Michael J. Myers

41